I'd like to start by referencing a quote from the Hague Convention Explanatory Report, providing that the interest of the child in not being removed from its habitual residence gives way before the primary interest in not being exposed to physical or psychological danger or being placed in an intolerable situation. All other interests served by the Convention are secondary to the child's safety. This common sense principle is embodied in Article 13b. The court may refuse to send a child to her habitual residence if the court concludes that doing so would expose the child to a grave risk of severe psychological or emotional harm. Now, maybe we should focus on the psychological harm, but if this child is returned to Argentina, would you agree that there isn't, and from what I understand from the Republic of Argentina, this child would be in the care of her mother. Yes, Your Honor. And that Argentina has said that it will do everything possible to make sure that there isn't any physical harm. So is what we are talking about here only psychological harm and not physical harm? No, Your Honor. We would argue that there is still a risk of physical harm. Is there a restraining order against Adan, now in effect, in Argentina? Yes or no? Yes. Then why would Argentina? For preventing any contact with the daughter? There was a restraining order that was in effect in December of 2003, and the hearing on that was adjourned, and the restraining order was violated by the petitioner, and that was ultimately what led to this violation. You're talking about a restraining order in Argentina? Yes, a restraining order in Argentina, which is now almost five years old. Are you sure it hasn't expired? I am not, Your Honor. And what were the terms of the restraining order? The terms of the restraining order were to limit the contact or to prevent the contact with the mother, and I believe limiting the contact with the child pending a hearing. Limiting or preventing? Prohibiting or limiting? If I could return to that on rebuttal. Yes, okay. Now, is there a restraining order in effect still in Union County? Yes, Your Honor. Against the father? Yes, Your Honor. Preventing him from any contact with the daughter? Yes, Your Honor. And to return to Judge Ambrose's question, I would, I guess my point is, is Argentina any less capable of dealing with a restraining order than a state authorities in New Jersey? Well, I believe that in this circumstance, the cases don't turn on a referendum of Argentine law, and as Judge Posner stated in Vandisant, what we're going to do is Are Argentine authorities any less capable than New Jersey authorities of enforcing a restraining order? Well, what we're dealing with here, it would appear that the past history in this case indicates that this petitioner is adept at violating court orders. Well, he's not so adept, he keeps getting caught. So, I mean, the question here is, I'm just going to, actually I'm throwing you a softball, but shouldn't you be focusing on psychological harm as opposed, or an intolerable situation as opposed to physical harm? I believe that we're focusing on both. Psychological harm is a tremendous issue in this case. It's the issue in the Blondin case. This is precisely the same circumstance. The diaper support details, these details. Now wait a minute. We're not, remember what we discussed earlier? Yes. All right. I want to just see if I could follow up Judge Ambrose's question. We have to consider whether Ariana faces a grave risk of physical or psychological harm until such time as custody in Argentina is determined, right? There is. We're not making the custody determination. And once the custody determination is made, assuming she goes back to Argentina, we're only looking at that window, which could be a couple of weeks, could be a couple of years. We don't know, right? Well, there is some split in the law on that. The First Circuit in Walsh indicated explicitly rejected that. However, I don't think it changes the analysis here. It doesn't change the analysis, but that's precisely why I led off with a question. Is there a restraining order prohibiting the father from any contact with his daughter in Argentina? And if so, you know where I'm going. Yes. How can there be a grave risk of physical harm to her? Well, essentially returning the child with Elena's custody puts her back into the same situation they were in that they had to flee, where a restraining order was in place. They violated the restraining order, and they had to flee. Again, going back to Judge Posner. Should they flee the United States because he violated the restraining order here? No, Your Honor, they didn't. Should they? They should not. Because? I didn't understand that answer. Would you state that again? I'm sorry. Was there a restraining order in the United States which he violated? Yes, Your Honor. That was the one in Union County? Yes, Your Honor. Was that in evidence? Yes, Your Honor. No, I don't remember. There's a temporary restraining order and a final restraining order that are in evidence. Mr. Lezovich, this particular matter, I think, is a matter of public record. That particular. Yes, it is. So I think you can answer Judge Garth's question. There's a temporary restraining order and a final restraining order that are in evidence, as well as a certified copy of a conviction for the petitioner violating the restraining order in Union County by breaking into a safe room in the Union County Courthouse. Now, I can't tell whether or not there's a restriction on the matters that were precluded from evidence by the district court, and I'm going to try to very generally identify them, such as any email sent from Aiden to Avens on January 27th, 2004. Can you tell me whether that is in evidence? We did not move to seal that. We believe it is in evidence. A review of the trial transcript reveals that there is some confusion as to how this trial was conducted, and there is some confusion sometimes as to what is in evidence and what is not. Is that the email where it is claimed that he would rape her totally? Yes, Your Honor. What about the testimony that he pled guilty to domestic violence for approaching Avens in the Union County Courthouse? Is that in evidence? The testimony of it is the district judge essentially stated to the parties on the record several times that he was not interested in anything involving their behavior after they came to the United States. He found that to be irrelevant to the analysis, which obviously is contrary to Judge Ambrose's previous decision.  It's not as relevant to the grave risk analysis as it is the violence in Argentina. Why don't you ask your questions, and I have a number of questions as to what is and was not precluded from evidence that I will get to later. You brought out that the Barron case recently was decided by the 11th Circuit. Yes, Your Honor. And in the prior decision that I wrote, I had talked about there being two things that had to be proven. One, that there was a grave risk of harm, plus that courts in Argentina were either unwilling or unable to protect against that harm. That's one way you could look at it. Barron says, look, all the statute requires is grave risk of harm, whether the courts are willing or not, who knows, regardless of what the courts do. A middle ground would be one could make an argument, possibly, that what I wrote previously in this case was anyway. A middle ground would be that there's a grave risk of harm includes whether courts would be willing or unable to protect against that harm, because if the courts protect against it, ipso facto or logically, there isn't a grave risk because you're insulated from it. There's also another argument that you can get around all of that by saying, forget whether there's a risk of harm from the father. There is, in this case, a risk of harm to this young girl simply by forcing her to return to Argentina and the traumatic hearing that will take place. Is that an argument that can be made? Yes, Your Honor, that is certainly an argument that can be made. Is that an argument that can be made on any evidence in the record? It is a more difficult argument to make based on the evidence in the record. There is some testimony from the mother in the record. There is testimony from Dr. Borgia regarding the sexual abuse in the record. There are medical progress notes in the record, although those detailing explicitly Ariana's disclosure of sexual abuse to her therapist, they don't go directly to the psychological harm that would occur upon return to Argentina. However, it's a very fair inference to make, and the DIFAS report simply puts the icing on the cake, so to speak. I asked you before to be guarded. We'll get you back in rebuttal when they give you some more time. Let me get Mr. Lesnovich up and ask him some questions. Thank you. Thank you for hearing me, Walter Lesnovich, on behalf of Arielle Adon. Pick the microphone up. Mr. Lesnovich, I want to ask some questions, and I think you can answer each one with a yes or a no. I will assume for purposes of this question that the father will have no contact with Ariana if she's returned to Argentina until such time as the custody determination is ready. Understood? Do you dispute that Ariana will be distressed and indeed traumatized by the mere fact of having to return to Argentina? I can't answer yes or no. I have no idea. There's no evidence. No one's examined that. No one's asked her that. There's nothing on that point. Nothing. Well. I don't know. Are you saying she will go gladly to Argentina? I've never met the first child, and I don't know. Let me move to my next question. Do you dispute? Now, I'm being guarded in my questions, and you know what I'm referring to. Yes, ma'am. And you're an officer of the court. Yes, ma'am. So we'll let the first question pass. Do you dispute that if Ariana is ordered to return, there is some reason to believe she will seriously harm herself and has some awareness of how to do it? No. I've never heard anything like that. Do you dispute whether or not what she said is true? Do you dispute what she is stated, reported to have said to various professionals? I don't know. I'm sorry. Are you saying? There's no evidence. There was no hearing. There's no. Wait a minute. Do you dispute that Ariana exhibits symptoms of trauma and needs to continue comprehensive therapy? I don't know. There was no testimony. All right. I'm sorry. Okay. Okay. One more time. Counsel to the left sidebar. Off the record. Turn off the mic. Did he object to the sealing of the diaphragm report? We also sealed the conviction of the father for violating the restraining order in Union County. This morning that seal was lifted and the parties in response to Judge Garth's question referred to his conviction. The question becomes what do we do now with the diaphragm report, which is in the record of this case and is an extensive report of what has gone on with this little girl over a fairly long period of time. Ms. Rockwell tells us at sidebar he moved to seal it because it was at Dyfus' request. He has just consulted with the Dyfus representative who is here who has agreed to lift the seal. We are therefore lifting the seal of the Dyfus report and you can both feel free to discuss it. I will resume with my questioning of Mr. Lesnovick. You may be seated, Mr. Rockwell. Mr. Lesnovick, do you dispute that whether or not Ariana will have any contact with her father in Argentina? The Dyfus report makes it quite clear that she is profoundly distressed and indeed traumatized by going to Argentina. Do you agree that that is what is said in the Dyfus report, yes or no? Yes, it does. Do you dispute that if she is ordered to be returned to Argentina, the Dyfus report said she will try to kill herself and indeed has told the doctor how she would do it? Yes, the report says that. Do you agree or do you dispute that the Dyfus report says that Ariana exhibits symptoms of trauma, sexual abuse, aggression, nightmares, fears, anger, and needs to continue comprehensive therapy? The report says that. Do you dispute that whether or not what Ariana told the various medical professionals is true? Do you dispute that indeed she reported those things to the medical professionals? I don't know if she reported it. Do you have any reason to believe that the medical professionals are lying when they say in the Dyfus report all of the things that she has reported to have said to them? No. So that the Dyfus report in this record would appear to say to me that the very fact she goes back to Argentina, separate and apart from whether she ever sees her father when there, has put her at grave risk of psychological or physical harm. Physical in the sense that she could cause herself physical harm and psychological in the sense that she would be profoundly traumatized. That's what the report says. You can take it from there. But, Your Honor, State v. Michaels, which we didn't cite, is a case in New Jersey that makes it very clear that once you begin a discussion of these very issues with a child, later psychological and psychiatric investigation is useless. Once you raise these questions and debate them for a year. I missed you. What? Once you raise these issues, State v. Michaels held, once you raise these issues. What issues? Sex abuse. Yeah. And discuss them with the child. You see, I have been very careful not to ask you about sexual abuse because, I tell you, most of the allegations came through the mother. So I'm being very conservative here. That's why I am pointing to the allegations of sexual abuse, to the extent I mention sexual abuse at all, that came from the little girl's mouth and at an age where I would think, and I make no such finding, nor could I, I don't have the expertise, she couldn't be programmed by the mother. Your Honor. And many of those things, there were several of those things, in the record of this trial that Judge Walz did not refer to in his opinion. Your Honor, I'm sorry, I strongly disagree. That child could very well be programmed, and all the literature says it. There's extensive psychiatric literature showing the programming that goes on. I understand that. I understand that. I understand that. Judge Walz has made no such finding. Judge Walz has ignored the words coming from Mariana's mouth. This report wasn't before Judge Walz. That's right. Dr. Borges' report, the Trinitas medical reports were in. Dr. Borges was in. No. Judge Borges testified, and I asked her a question. Do you have an opinion? She said, no, I don't have an opinion. She was the entry interview. She said there's a possibility of sexual abuse. The girl has to be referred for tests. But she described things that the girl had said. Your Honor. He licked it. That interview came one year before the trial. The mother never brought the child back, never brought her back. There never was any follow-up. Dr. Borges, she said, I have no knowledge why I'm here. I have no opinion. Let's get Borges. Let's get Borges. Okay. Here we go. It's at 734. Page A, 734. She said, my conclusion was the child could have been sexually abused and they need further testing and they need further studies. That's right. That's right. Dr. Borges testified that during her evaluation of Arianna, Arianna exhibited sexualized behavior, including striking herself in the vagina and reported memories of her father kissing and licking her vagina and kissing her with her tongue. I'm reading from what the trial testimony is. Yes. Judge Walz didn't mention that. The Trinitas Hospital medical progress notes, Exhibits D, 14 and 15 at trial, reveal that during a separate evaluation, Arianna stated that she wished Daddy was dead because Daddy put it in my butt and he said it was going to be soft, but it was hard and it hurt me. Page A, 1004. Arianna also told the crisis worker that Adan touched me here, pointing to her breasts and then squeezed them really hard and he made her eat a sock so that no one would hear her scream. Judge Walz did not mention those allegations, did he? No. And that was evidence at trial. From the little girl, not a wife in a custody dispute or a wife in a divorce, a messy divorce. This is what the little girl said. Now, maybe she was programmed. I know the literature. The girl was a little, little for a lot of that. But beyond that, and this is the important thing, Judge Walz made no such finding. Indeed, he didn't even mention what the little girl had said. Okay. Take it from there. I promise I have no more questions for at least 30 seconds. Go. Well, actually, before you do that, I'm just going to add on from now the DIFAS report, which has been unsealed. And it's on page 9. It's a very comprehensive report, 25 single-spaced pages. Page 19. When asked, she said she thinks about killing herself. That's the bottom of the page. She does not think she would do it. When asked to tell more about why she would want to kill herself, she replied, no, so I don't have to go to Argentina, quote, unquote. Asked if she has ever thought about how she would kill herself, she said she would use a knife and demonstrate it slitting her throat. And it goes on later on. Even though she said she did not think she would carry this out, Ariana's distress is clearly high and should not be ignored or overridden. She was 6 years old at the time. 6. You turn to page 22. It says emotional, the paragraph beginning, emotional assessment of Ariana also suggested numerous problems. Test results indicate she is experiencing depressive features, including feelings of powerlessness, inability to experience much pleasure and low self-esteem. Of significant concern is Ariana's statement to the effect that she has considered killing herself as an alternative to going to Argentina. She has been told that she might be going. Not only did she say she has thought about killing herself, but she has also been able to provide a description of what exactly she has considered doing, slashing her throat with a knife. This is quite unusual in a child of her age. Ariana goes down further. Ariana's comment is one that cannot be ignored. In all, Ariana's presentation indicates that she is emotionally vulnerable at this time and in need of ongoing therapy, a finding that incidentally is consistent with that of Ariana's therapist. Going on to the next page. The best interest of the child and the harm that would come to her if she is compelled to return to Argentina under the current circumstances. With respect to this issue, it is felt that Ariana's best interest would be severely compromised if she is bade to return to a country she does not know, to a setting populated by strangers, all of whom would be speaking to her in a language with which she is, which should be with which she is not familiar, where she is familiar but does not speak fluently. She presents as a child with features of traumatization. And I could go on and on. That's not in the record. I concede. But when you add that to the stuff that was before Judge Walls that he never really considered, at least in what we have before us, don't we have a major issue? Your Honor, there is a mechanism for the introduction of a DIFAS report into a custody hearing. We're not doing a custody hearing. This is not a custody hearing. This is the question. It sounds somewhat like it, though, now. No, it has nothing to do with custody. I know. The question is, which country decides? That's right. When you bring a DIFAS report into your decision process in a state court, it is challengeable. You do examination of the writer. I've never met the author of the report. It was submitted after the fact. But within the DIFAS report are the reports of several individuals, medical professionals, social service professionals, who had articulated reports, things they had discussed, tests that had been done of the girl, the results of the tests. But in state court I would confront them. I would be able to talk to them. I would see whether they're right or wrong. Here I have nothing. This comes at me after. You've had this for months. Oh, certainly, but I can't subpoena the people. You agreed it should be in evidence. You did not object to us taking it into the record. You did not object. I objected to the record, not into evidence at a trial. It was not presented for a trial. Well, let me ask you something then, Mr. Lesnick. I have a very partial listing of at least 12 items that were excluded from the evidence by the district court. And these were matters that have to do with Mr. Aden's violence against his wife and against his second wife and his former girlfriend and restraining orders and various Argentinian restraining orders. And they were never – I can't tell whether they were ever entered into evidence. None of them. None of them. And why was – what was the reason for excluding them? They were not certified copies. They were pieces of paper. They had nothing to indicate they were authoritative. But under the convention that we are operating under, it is not precluded by virtue of the fact that they have not been verified. Isn't that so? It can be. But the district judge said to the attorney, these aren't verified. They don't conform to the federal rules. Would you like an adjournment? Would you like a continuance? He withdrew them. But the convention itself permits those documents to be entered into evidence. If you convince the judge of some standard, I stood there saying, why don't you take the continuance? Why don't you show the judge why you think these are true documents? Nothing happened. Mr. Lesovitz, you say at page 45 of your brief that the district court tailored an order to ensure that Adan would not abuse Ariana. Where is that in the record? Where is the district court's – That came in the second – Where? Where is it in the record? Where in his opinion? Where in – He held a hearing a month later. And that's where it was all set out. Where was it ordered that he is to have – would not abuse – entered an order to ensure that Adan would not abuse Ariana? Give me the record reference. He ensured that he would not have contact with her. Where? Give me the record reference. That's in the hearing that was held a month later. I want the record reference. I have the opinion that follows that hearing, and he doesn't mention anything about it. Well, he had said that, and we had agreed that Mr. Adan would have no contact whatsoever. Well, you and he may have agreed, but I see nothing in this record. The judge said, if you consider, Your Honor, the judge said the daughter would go on the plane with the mother, be met by Argentine police. Logistics. So the father would have no contact whatsoever. Where does it say that in the record? Where does he say that? It's not specifically within the language of that order. No, it is not. But he said that there would be no contact. You're way over your time. Are there any other questions? Rebuttal? Thank you, Your Honor. I am advised from my counsel that the original restraining order in Argentina is expired, and I would point to the letter from the Argentine Central Authority that was submitted with the Argentine amicus, and that is in their supplemental appendix at page 1. If you go over to page 2, it states, I'm sorry, on page 3, it states there currently is no order in place to prohibit Mr. Adan from having access to his daughter in Argentina since his parental rights have neither been terminated nor suspended. Ms. Avins would be able to request a restraining order through her attorney or an agency. In addition, if the United States court determined that certain conditions, such as supervised visitation, should be imposed while the custody dispute is adjudicated, or if the father should agree to such conditions, then that undertaking may be enforced by the judge in Argentina. Mr. Rockwell, when the various items of Mr. Adan's conduct and his arrests and his abuse and his violence were offered in evidence, tell me now why they were not admitted, particularly since the convention permits that type of document to be admitted without verification? Your Honor, I can't answer that question. I don't know why. Well, were you questioned about it? As I gather from Mr. Lesnovich, that there was a question that was put to you about it. Your Honor, we weren't trial counsel. We weren't trial counsel either. We have to know. There was no questioning from the judge as to whether it met the relaxed standard of the Hague Convention. There was no specific reference of it. He didn't discuss that at all, and he basically said, I don't want to treat this as a non-domestic relations matter, and he gave the short answer. Exactly correct. Exactly correct. All that evidence didn't come in because of that, and some of them are police records, investigation reports, and the contention that they're just a piece of paper. It's not like they weren't handwritten documents or something like that where there was some real question as to their authenticity. We are going to take a five-minute break. Can I just ask? Yeah. What relief do you want from us? Your Honor, ideally, we would prefer this Court to be able to look at this record, look at the supplemented record, and view the totality of the circumstances the way you initially requested that Judge Walls do and reach a conclusion that there could be no finding of fact that there is not a grave risk of harm to Ariana by returning her to Argentina. So what you're saying is conclude as a matter of law that there could not be a finding of fact? Yes, Your Honor. But what you want, isn't it, is a dismissal of the petition? Yes, Your Honor. Isn't that what you want? A reversal with an order dismissing the petition. We're going to take a five-minute break. Counselors remain at their positions. Yes, Your Honor. Thank you. The petition under the Hague Convention at issue here was filed on October 21, 2004. For almost four years then, this case has been ongoing. Two trials, two appeals for starters. And the parties, most especially this little girl, who even now is only eight, have been, for lack of a better word, in limbo. We see no reason for it to continue one more day. And so we now do what we very rarely do. We will decide this case from the bench. In broad summary, we conclude the respondent has shown, by clear and convincing evidence, indeed, as a matter of law, that there is a grave risk that Ariana's return to Argentina would expose her to physical or psychological harm or otherwise place her in an intolerable situation. We may or may not issue an opinion at a later date explaining our conclusion. But judgment will be entered today, reversing the June 26, 2007, and July 20, 2007 orders of the District Court and remanding to the District Court with instructions that the petition be immediately dismissed. I recommend, Mr. Rockwell, that you submit a proposed order to the District Court immediately. Is there anything else in this counsel? Would you adjourn the court, please? Thank you. Thank you.